Argued May 19, affirmed July 8, 1975

O'NEAL, *Respondent, v.* SISTERS OF
PROVIDENCE (No. 411-513), *Appellant.*

537 P2d 580

*Mark H. Wagner,* Portland, argued the cause for
appellant. With him on the brief were Michael D.
Hoffman and Souther, Spaulding, Kinsey, Williamson
& Schwabe, Portland.

*Peter C. Davis,* Portland, argued the cause for re-

spondent. With him on the brief were Merten & Saltveit, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

FOLEY, J.

The Sisters of Providence, operators of St. Vincent Hospital (employer), appeal from a circuit court order affirming a Workmen's Compensation Board order. The Board reversed a hearings referee and held that claimant was entitled to compensation for leg muscle problems which were attributed in part to her employment.

The essence of employer's position is that claimant's claim is not compensable because it is not work-related or because it represented the continuation of a condition for which a claim was accepted and closed by a determination order, dated June 7, 1972, which did not award any permanent disability and which was not appealed.

At the time of the hearing, claimant was 51 years old and had worked as a maid at St. Vincent Hospital since December 1970. Her job required that she push a maid's cart over carpeted halls. The cart was four feet high and four feet long and was loaded with various cleaning materials, a garbage sack, mops and a bucket. There is no exact evidence as to the total weight of the cart; claimant testified that the bucket and mop weighed nearly 50 pounds, and that the remainder of the cart weighed at least as much. The cart had 10-inch casters to make it roll easily.

Claimant began having difficulty with her legs in March 1971. A medical examination on July 30, 1971, revealed varicose veins, some phlebitis, and

strain in the muscles of both legs. Claimant filed a workman's compensation claim on September 21, 1971, which stated that pushing and pulling the maid's cart over carpeting for the previous six months caused strain in her knees and legs.

On November 24, 1971, the employer notified claimant that its investigation revealed that she suffered "from two separate ailments, namely varicose veins and a leg muscle strain. * * *" The employer denied responsibility on the varicose vein problem but accepted the claim on the muscle strain. (It appears that the references in the medical reports to muscle "strain" and muscle "spasms" are references to the same general condition.)

Claimant returned to work after her initial 1971 period of disability. She had surgery for her varicose veins in July 1972, and again returned to work.

A determination order issued June 7, 1972, awarded claimant temporary total disability, but no permanent partial disability, for her leg strain disability of 1971. Claimant did not appeal either the denial of responsibility for the varicose veins or the determination order.

Although the pain in her legs persisted, claimant continued working. By November of 1973, however, she began having to take rest breaks, during which she raised her legs to relieve her pain. On February 7 or 8, 1974, Dr. Robert E. Rinehart, claimant's treating physician, ordered her to stop working. It is his opinion that her work conditions are a material cause of her leg muscle spasms. On June 28, 1974, claimant filed her second claim for spasms of her leg muscles. The employer denied the claim, leading to the current litigation.

The hearings referee denied claimant compensa-

tion for both the leg varicose vein problems and the leg muscle spasms, finding that she had not established "* * * a new injury or occupational disease claim. * * *" The Board affirmed the referee regarding claimant's varicose veins but reversed the referee in regard to the muscle spasms, finding that their presence in 1974 constituted a "new claim." The Board ordered the employer "to accept claimant's occupational disease claim for muscle strains in both her legs as a new injury February, 1974."

Some confusion exists in this case because of a failure, on the part of claimant, employer, and the hearings referee, to clearly distinguish between a "compensable injury" and an "occupational disease." Claimant testified that her leg problems had been continuing for four years and that the condition which bothered her in 1974 was the same as that of 1971. The employer points to this testimony, and claimant's testimony in which she describes her 1971 symptoms and 1974 symptoms in similar terms, contending that claimant suffered no "new injury or occupational disease" in 1974, and was precluded from relitigating the 1972 determination order on the initial claim because time limitations for appeal had passed.

Claimant at the hearing expressly abandoned any claim for aggravation under ORS 656.273. Thus her claim is compensable only if it fulfills the requirements of a compensable injury or an occupational disease.

■ Since claimant's symptoms by her own testimony were the same from 1971 to 1974, we agree with the employer's contention that if her 1974 condition is an injury, it would not constitute a "new" injury and would not be compensable. Our ultimate decision as to compensability therefore turns on whether claimant's condition more properly falls into an occupational disease category.

ORS 656.802(1) (a) defines "occupational disease"[①] as:

"Any disease or infection which arises out of and in the scope of employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein."

ORS 656.002(7) (a) provides:

"A 'compensable injury' is an accidental injury * * * arising out of and in the course of employment requiring medical services or resulting in

---

[①] The employer has not contended that claimant suffers from an ordinary disease of life as opposed to an occupational disease. We note in any event that claimant's disability, if categorized as a disease rather than an injury, would be categorized as an occupational disease rather than a nonoccupational disease. This is true even though claimant's conditions of employment merely represented more extensive exposure than usual to conditions existing in everyday life. As Larson has stated:

"Just as chills and temperature changes are features of everyday life, so are bumps, jars, jolts, and strains—within limits. But repeated strains associated with the employment may supply the distinctive element necessary to make a back injury occupational. Tenosynovitis suffered by an employee whose work consisted of lifting and moving boxes and using a hammer and drill, causing her to twist her shoulder and move her arm back and forth, has been held to be an occupational disease, even though a housewife might contract the disease in the course of certain household duties. And bursitis of the shoulder from pushing a lever 500 to 700 times a day has been held covered under a statute defining occupational diseases as including those 'due to causes and conditions . . . characteristic of or peculiar to the employment.' " (Footnotes omitted.) 1A Larson, Workmen's Compensation Law § 41.33 (1973).

In Beaudry v. Winchester Plywood Co., 255 Or 503, 469 P2d 25 (1970), our Supreme Court took a similar approach, finding that a claimant who stood upon a vibrating base as part of his employment was entitled to compensation for an occupational disease consisting of agggravation of his pre-existing bursitis, even though the physical activity of walking, standing, and going up and down stairs could also aggravate claimant's condition. The essential factor was that the employment conditions were found to be the main cause of aggravation.

disability or death; an injury is accidental if the result is an accident, whether or not due to accidental means."

The Supreme Court has discussed the distinction between occupational diseases and injuries in reference to earlier statutory schemes (*repealed*, Oregon Laws 1973, ch 543, § 4) which provided different procedures for processing occupational disease claims:

"One who claims that he is afflicted with an occupational disease has undergone experiences substantially different from those of another workman who is the victim of an industrial accident. An occupational disease is stealthy and steals upon its victim when he is unaware of its presence and approach. Accordingly, he can not later tell the day, month or possibly even the year when the insidious disease made its intrusion into his body. Although his weakened condition may manifest ill health its cause may be uncertain and puzzle even the most skillful of physicians. Upon the other hand, the victim of an industrial accident virtually always can tell the day and even the hour when the purported injury befell him. He does not attribute his present condition to something that crept in upon him unobserved but to an accident which he and possibly others observed. * * *" *White v. State Ind. Acc. Com.*, 227 Or 306, 322, 362 P2d 302 (1961).

Legislative amendments to the Occupational Disease Law (Oregon Laws 1973, ch 543) have brought occupational disease claims fully within the Workmen's Compensation Law and, as ORS 656.802 to 656.824 reveal, in general, treat occupational disease claims in the same manner as injury claims. In addition, the definitions of "occupational disease" and "compensable injury" are similar in several respects. Both relate to a condition arising out of and in the

scope or course of employment. Further, ORS 656.804 provides:

> "An occupational disease * * * is considered an injury for employes of employers who have come under * * * [the Workmen's Compensation Law]."

Finally, the procedure for processing occupational disease claims is the same as that for accidental injuries. ORS 656.807(4).

Larson points out that with the expansion of occupational disease legislation (as has occurred in Oregon)[2] the "contrast between accident and occupational disease is gradually losing its importance * * *." 1A Larson, Workmen's Compensation Law § 41.31 (1973).

Yet in Oregon an occupational disease continues to be distinguished from a compensable injury in that the former must be a "disease or infection," ORS 656.802(1)(a), whereas the latter must constitute an "accidental injury." ORS 656.002(7)(a). The statutory treatment of times for filing a claim continues to reflect this distinction: One suffering from an occupational disease has as long as five years "after the last exposure" to file a claim whereas one suffering from a compensable injury must generally file a claim (notice) within 30 days, or under certain circumstances within one year, from the date of the accident.[3]

---

[2] *See* Oregon Laws 1973, ch. 543.

A useful discussion of some of the developments in Oregon up to 1962 in this regard is contained in Lafky, *Compensability of Occupational Disease Under Oregon Workmen's Compensation Law*, 2 Will LJ 16 (1962).

[3] ORS 656.807 provides:

"(1) Except as otherwise limited for silicosis, all occupational disease claims shall be void unless a claim is filed with the State Accident Insurance Fund or direct responsi-

It thus appears that the distinction between an occupational disease and an accidental injury has become less significant because of changes made by the 1973 legislature, but, as this case and the different time limitations for filing an occupational disease claim indicate, the distinction has some continued importance.

Larson synthesizes the occupational disease-accidental injury dichotomy when he notes that there are "two crucial points of distinction" between accidental injuries and occupational diseases: the elements of "unexpectedness" and "time-definiteness." He explains these distinctions as follows:

"* * * What set[s] occupational diseases apart from accidental injuries [is] both the fact that they can[not] honestly be said to be unexpected, since they [are] recognized as an inherent hazard of continued exposure to conditions of the particular employment, and the fact that they [are] gradual rather than sudden in onset. * * *" (Footnotes omitted.) Larson, supra.

---

bility employer within five years after the last exposure in employment subject to the Workmen's Compensation Law and within 180 days from the date the claimant becomes disabled or is informed by a physician that he is suffering from an occupational disease whichever is later.

"(2) If the occupational disease results in death, a claim may be filed within 180 days after the date of the death; and the provisions of subsection (1) of this section do not limit the filing of a claim in fatal cases to less than 180 days from the date of death.

"* * * * *"

The general filing provisions of the Workmen's Compensation Law contain narrower time limitations. A claim is "any compensable injury of which a subject employer has notice or knowledge." ORS 656.002(6). A claim is barred, with certain limited exceptions, unless an employer has knowledge of the injury or is given notice of the accident within 30 days after the accident (or within one year after the accident if good cause is established for failure to give notice within 30 days). ORS 656.265.

The same concepts are reflected in *White v. State Ind. Acc. Com.,* supra. *See also Mathis v. SAIF,* 10 Or App 139, 499 P2d 1331 (1972).

■ Applying these distinctions to the present case, the evidence establishes that claimant's muscle spasms arose out of her work activity. It could not honestly be said that it is unexpected that leg muscle spasms might develop from extensive pushing and pulling of a large, maid's cart. It also is clear that the muscle problems were gradual in onset. We therefore conclude that claimant's disability resulted from an occupational disease rather than an accidental injury.

Further, we note that what is important here is not whether claimant's occupational disease is characterized as "new" or "old." The compensability of an occupational disease turns upon whether it leads to disability, *Beaudry v. Winchester Plywood Co.,* 255 Or 503, 512, 469 P2d 25 (1970), and disability is the key factor regarding the timing of the filing of this claim. ORS 656.807(1).

Claimant's occupational disease has existed over a span of four years. In 1971 it became disabling. Claimant was compensated for the period of that disability and was able to fully return to work. Her condition was stable. In these circumstances she had no reason to appeal the determination order on her first claim. When claimant again became disabled in 1974, she was entitled to again seek compensation for her disability.

The Board and circuit court found that claimant's muscle spasms constituted an occupational disease for which a compensable claim was filed in 1974. We agree.

Affirmed.